2007, CSX Corporation and others against the United States. Mr. Shulman, you may begin when you're ready. Thank you, Your Honor. May it please the Court. I would like to begin my argument with the issue of whether or not the separations by management employees and unionized employees who took separation who were forced transferred met the test of being involuntary. The Court below addressed this issue with the following words. Though avoidance of economic uncertainty may indeed force such a decision, where the decision itself originates with the employee, the separation must be regarded as voluntary. The decision, in this case, originated with the employer. It was forced upon the employees in the context of massive force reduction and serious economic uncertainty, extraordinary economic uncertainty. The separation program was the result of lengthy and difficult negotiations between recalcitrant unions and railroads and economic extremists. The second generation grew conscious to agreement separations, followed an eight to nine year struggle. They reduced the number of break-ins by 50 percent. The force reduction of all the employees during the period 1984 to 1990 came to 20,000. All that's in your brief, isn't it? Yes, it is, Your Honor. having charges brought against the employee for malfeasance or misconduct or resigning, the employee chooses to resign and later claims that the resignation was involuntary. Our uniform rule is to say, even though you are faced with two difficult and unpleasant choices, when you make a choice, it's a voluntary choice and you do not get the benefit of an involuntary resignation. Isn't that the same problem we have here? No, not at all, Your Honor. Why not? May I make two points with respect to your question? Sure. The first one is that not one word has been said on that subject in the briefing on this case. On what subject? On the subject of the government employee's resignation. Yes, I understand. I'm just inviting your attention to a parallel problem. One of the things we recognize in our jurisprudence is that the people who work in one field almost never are familiar with the cases in our other fields, and that's unfortunate. I don't hold you to it. I just wonder how you would respond to it. Okay, but part of my response is that the government of the United States also didn't seem to think that this was governing this field. Now, the answer is that what you are talking about has to do with individual terminations or resignations in positions of apparent personal difficulty. What we're deeming with sub is involuntary in the large scheme of things. The question is whether or not the mass of people that are affected are affected in an involuntary and a mass basis. This is not a situation where you have idiosyncratic examination of each individual. That's the basic difference between sub, where you're talking about workforce reductions, and individual terminations, where you're talking about individual performance. The cases that you're talking about have to do with whether or not the employee performed satisfactorily. Our case has nothing to do with that because the employees who performed satisfactorily were told that's not good enough. The fact that you performed satisfactorily is not a test. So in sub, you're looking at a larger problem, and the question of the economic extremists that replaced everyone is totally relevant. I mentioned to you that the employment dropped from 54,000 to 34,000, but in 1980, when CSX was formed, the railroad employment was 74,000. That's in stipulation number 70 of page 22. So you would have already had a reduction in force of 27% by the time you got to 54,000. In the shop, crafts, and clerks, the separations programs came about as a means of stopping force transfer. That was the only way the unions could get the force transfers to stop. The impact of the force transfers, the laid-off employers, were very severe. If you take a look at stipulation 293 of page A330, it shows the effect on 507 laid-off clerks who had been subjected to force transfer from field positions throughout the United States to the Baltimore General Office Building. In those cases, 18% transferred, 16% forfeited benefits, and 64% separated. 64%. It's understandable that 64% separated. If you look at stipulations 279 and 280 on pages A325 and 326, you will see that four things came out of the Special Board of Adjustment and Arbitration. One, the railroads could transfer clerks in any order they chose. Two, they could transfer the clerks who were unqualified, who felt they were unqualified, who the unions thought were unqualified for the position. Three, they could transfer clerks to temporary as well as permanent positions. And four, they could continually transfer clerks to a single vacancy until one clerk finally accepted it. Separation under these circumstances is a rational choice for a shop draft on layoff. Why would you transfer to a temporary vacancy and then get laid off when it ran out? Counsel, can I redirect you for a second? I have a question. In our interpretation of the subprovision, in the end, whether something is a subpay or not, it's all going to be income taxable under the Internal Revenue Code, correct? Severance pay is income taxable. And the reason that you are very interested in having these payments classified under sub is your argument that subpayments, since the title of the sub statute in 34020 says not wages, that these are not wages. And so even though they're not wages, they're still income taxable. But nonetheless, you're arguing because they're not wages, they're not FICA taxable. So that's why you want to have these various people classified and the actions that occur to them classified as subpayments, right? That is correct, except if I may, I would like to just deal with a small nuance of what you said. Sure. You said because of the title of 34020. We're not arguing it's because of the title of 34020. You say it's the language that as if they were wages. And the legislative history and everything else. There's much more than just the title involved, but your point is absolutely correct. It's absolutely clear in the legislative history and in the title and in the statute itself that these were not wages as wages is determined for purposes of the Internal Revenue Code. Why should they not be wages for purposes of FICA even if they're not wages for the purposes of the Internal Revenue Code? They're taxable. They're taxable as income. And I recognize there are lots of things that are taxable as income that aren't taxable under FICA. Dividends, for example. But those are the kinds of things that aren't derived out of the context of the employer-employee relationship. So when you start thinking of severance payments, these people got 50,000, many of them, to waive the contracted employment rights they were entitled to when they joined the organization under the collective bargaining agreement. So that 50,000 is really not any different than 60% for 60 months, and that sounds an awful lot like something that would arise in the context of the employer-employee relationship. As such, why don't we treat this as wages? Why don't we treat them as wages for FICA purposes? Why shouldn't they be? First of all, Yvonne, if they are so, to the extent they are so, they cannot be treated as wages because Congress said they are not wages. The IRS doesn't have the power to make something wages. It has the power to exclude something from wages, but not to include something in wages. But second— Have they been traditionally by our courts always treated as wages, severance pay, that is, payments made in light of someone leaving their position, for FICA tax purposes? Have our courts and other regional circuits traditionally treated them as subject to FICA tax payments? Well, if you'd like to answer, I can address that question. You have had separation payments before your court twice. Once was in the case of Abrahamson versus the United States and was an associate electorate. I believe that you, Judge Klager, are familiar with one of those cases. Probably more so than I am. More so than I want to be. But anyway. In Abrahamson, the severance pay—I'm getting nervous about my— Well, why don't you go ahead and respond to the question, then we can address how much of your rebuttal time you want to spend. I understand. Go ahead. We'll give you a little extra time on rebuttal. In Abrahamson, the severance pay is one week's salary for six months of service, up to a 52-week salary. I think I understand where you're going, in order to save your time for you. It's where you're going that the distinction between that case and this one is this is $50,000 no matter how many years you've worked here, no matter who you are, no matter what. Whereas in those cases, it was based on your status as an employee, your length of employment, and those sorts of things. And you're already in other issues. Yes, that's correct. So what? Well, because that is, in fact, how you decide whether you want to— Is that how we decided, or is that sort of like a furthermore, this is further evidence of the fact that this was payment made in the context of the employer-employee relationship? I mean, I guess I didn't read those cases as saying, and if the payments aren't structured like this, then they can't be considered wages. I mean, I didn't read the cases as having such a strict approach to those payments. No doubt those payments added to the reason the Court concluded they're wages. But I didn't read those cases as saying in the absence of these criteria, something can't be treated as wages. Am I wrong in my reading of them? I would not want to say that you were wrong. No, I'm wrong all the time. You can say she's misinformed. If Your Honor is saying that you don't have to do that because it's obvious that severance pay and wages, then you would never have the discussion. I mean, the point is that if just because it was severance pay meant it was wages, you'd say this was severance pay, it was wages. But what if in those cases, those cases didn't have this situation where the employee was contractually entitled to certain post-employment benefits? Wouldn't that be something that would be indicia that the post-employment benefits are part of the employer-employee relationship, given that that's one of the reasons he took this job, is because he's got some security to make sure his family is not without payment if he should get laid off. He's got a guarantee of so many months at 60%. He's got a guarantee of certain benefits continuing. Wouldn't that be evidence of the fact that these are in the context of the employer-employee relationship, not sort of like a promise not to sue me afterwards? Here's money in exchange for a promise not to sue. They're not tort payments. They're clearly made in the context of the employment relationship. They're not tort payments. That's correct, Your Honor. And I very much am pleased with the fact that you identify that you get these rights right away. These rights are not earned by the performance of services. These rights attach either upon or shortly after employment. But they attach to employment, to the contract for employment, to the collective bargaining agreement. But these people were being let go, not because of services they were rendering, but because of their incapacity to render services, because they were all surplus. This whole thing all came about by reason of the fact that they were surplus. Look at the second break-in scene and the croutons. I mean, that was just an understatement. Let me ask you this question. Go ahead. There are two ways, Ms. Tillman, of looking at this thing globally. One way is the way you just articulated. Look, these people are given separation payments not because they're being employed by the employer, but because they're being unemployed by the employer. It has nothing to do with employment. And therefore, let's just acknowledge the fact that all of these payments are unrelated to the employment wage experience. They're the antithesis, right? That's one global position. The other global position is to say, look, all of this comes about because these people were indeed employees. If they weren't employees, there would be nothing to separate them from their employment, whether it's based on seniority or history or whatever. All of these payments are relevant only because there was an employer-employee relationship at some point in their world. And that's what these payments are involved with under the breadth of understanding about what a wage is. And it is very broad. I want to come back to the question of why you're not Rowanized. But under the breadth of that broad understanding, everything that was done was done in the employment context. And therefore, it's all wages. And I appreciate all the fine art of arguing that. But wait a minute. Under the withholding tax, we have a section that seems to say that this is—it seems to prove the negative. And we have all—we can go through all of that. But it misses the big point. The big point is either globally this thing has nothing to do with employment or globally it's all employment. At the moment, I'm inclined to think you are Rowanized. That is, it's all employment. And I want you to help me understand how you're going to escape from that beyond saying the 1983 Act, which talks only about regulation, sort of decouples it. How are you going to—is there any—do you have any better argument that Rowan doesn't exist? Yeah. I'd be happy to address that. Please. Can I make one point, though, just to try to clean up this one point? Don't worry about the red light. We'll extend your time. You have a problem. So do we. I'm in sheer terror. No, no. We've questioned you quite heavily, and we'll restore time to you. And our questions are long, and we understand. Right. And they're not a piece of cake, either. But I want to clarify that between the questions of yourself, Judge Piper, and Judge Wood, you made a bit of a merger that confuses one point, and then I'll get on to Rowan. If they are sub, they are not subject to FICA, period. If they are not wages, they are not subject to FICA. But they don't have to be both not wages in the terms that you were just talking about, Judge Piper, and not sub. I take it you'd be happy to be Rowanized. I understand Judge Piper to verbiage it. You'd be happy to be Rowanized, wouldn't you, right? Because if they're not wages under sub, they're not wages under FICA. Right. That's an interesting phenomenon. I mean, being Rowanized, as you just described it, is quite pleasant to me. You're right. I'll take that as a compliment. I'm not quite sure why. Let me take a try at Rowan to see if I can explain it. In Rowan, you were dealing with the question whether or not what was not wages for income tax could be wages for FICA. Precisely the question that we're facing here in the Supreme Court, although the Congress intended that they have the same meaning. Now, in the decoupling act, what the Congress said was that the language of the act itself is all regulations. Nothing in regulations excluding wages from income tax under this chapter requires civil exclusion under any other chapter. So, what that says is that if you have an exclusion from income tax withholding, you don't have to have an exclusion from FICA. That's what the decoupling amendment provided. Now, there's a dispute about whether or not regulations are required in order to do that, which I believe is what you were getting at when you were Rowanizing this. I misspoke with how I spoke. You're right. Right. Thank you. Right. And our position is that the statute does in fact require regulations and that the legislative history does in fact comport with what the statute says. Would you agree that the Second Circuit doesn't agree with that position? The Second Circuit? Kessling? I think is the name of the case. Is it Kessling? It's the Second Circuit case cited by the government. I may have misremembered the name of it. Well, anyway, let me find it. I don't have that name on the agenda. That's all right. I may have given you the wrong name. Well, it's conceivable that I missed that case. I'm sorry. Kinesias. Oh, oh, oh. I'm pretty far away. My bad. All right, go ahead. Well, Kinesias is a very interesting case. Well, but do you think, short of analyzing it, do you think that that is contrary authority to the position you just articulated with respect to the… Not really, not really. The Kinesias is, I would say, was sort of a way station in between the two. The Kinesias does in fact get to saying that this is wages, that what was involved there was wages. But what was involved in Kinesias was exclusions. Kinesias was a double exclusion. We started out with an exclusion from income tax for plans that produced retirement benefits. That was the initial exclusion. Then the IRS excluded from that exclusion those part of the pension plans which were financed by salary reduction. So that if the employee worked out a deal with an employer that would take less salary if the money went into the pension, that was an exclusion. So you had an exclusion from income tax, then an exclusion from that to be subject to flight tax. And then what happened in two fell swoops is Congress codified the exclusion that the IRS had for salary reduction plans. And it then made retroactively decoupling, leaving what was then only a ruling in effect. But the ruling was in the same words as the statute that Congress had just passed. And the retroactivity was simply confined to the situation where the employer had treated the payments as if they were wages. So it is a very, very specialized set of circumstances. But even if it says that you don't have to have regulations, it does not say that the IRS can include something that wages. It allows the IRS to exclude, and in this particular case it made an exclusion which had the effect of diminishing the exclusion that the US has made. That's a very important distinction, because after all, the taxing power is in the Congress, not the Internal Revenue Service. The Internal Revenue Service is in terms of it. I accused you of being rona. I meant to say you, according to the government, have been un-ronized. Is that right? Isn't that your problem? The extent to which you have been decoupled. That's correct. But my position, Your Honor, is that under either extent, either A, that a regulation is required, or B, that a regulation is not required. Under either, sub cannot be a wage, because sub is a congressional pronouncement. Because 3402 is a congressional pronouncement that sub is not a wage. But that's true only if they're coupled. Isn't that right? Yeah, that's right. Because sub, the congressional pronouncement, is in a separate area of the tax. That statement is the functional equivalent of Congress saying that sub is not quite that. Well, that's your argument, but the government doesn't accept that. I mean, I understand that that's your argument. This is what we're here to decide. We can't treat it as if this is a given and that we work from this as our starting point. You're assuming our answer, which is what's been puzzling me, which is why I tried to, I misspoke, but I tried to make the point that the key to this whole thing is the extent to which you are uncoupled. Isn't that right? Or unrowanized, as I should have put it. May I say, may I verbalize this slightly differently? I mean, I think that what you just said is a decent verbalization, but I suggest that a better verbalization is, did Congress possibly intend that sub as defined in 34020... Which deals with... Income tax withholding. Income tax withholding, that's right. Did they possibly intend that sub as defined in 34020 was going to be wages under FICA? And not included under FICA? Of course they could possibly have intended that. How could they possibly, excuse me, I'm not going to... How could they possibly have done that in the context where if they wanted to say that, they would say sub is wages. Why would they say sub is not wages, but nonetheless... Probably because, given the history, probably because the problem with calling them wages is because these things were supposed to be supplemental to the state unemployment benefits. That would have disqualified all these people from getting state unemployment benefits in many states that said if you're getting wages, you don't get the unemployment benefits. That, I gather, was the problem that they were dealing with. You probably know the history better than I do, but that's my understanding of the history. Well, if that were true... Well, is it true? That's my impression. If that were true... Well, the predicate question, do you think that's true, is my characterization fair? I think that's largely true, yes. Okay. But I think, but... So given that it is true, then... Then what's your point? It's amazing how you think, right? Now, the point is that Congress did that in response to a treasury effort to have sub taxed for FICA, FUTA, and income tax. They went up there and asked for that, and sub said no. I'm just kidding, Congress said no. It's not going to be wages. The real income taxes were income taxes. Congress knew exactly what it was doing, and exactly what it was doing is what the IRS is trying to undo. Let me see if I, let me ask you one more question, and then we'll let you take a breather before you come back on, reply to the cross appeal. What, the day before 3402 was enacted in 1969, I guess that was the enactment date. Yes. If your law firm, I suppose, or somebody else's law firm, not yours, decided that they needed to let an associate go, and the associate was given a $50,000 severance payment, the day before 3402 was enacted, would that have been subject to FICA liability, withholding a tax? That would not have been sub. Well, never mind that. Would it have, and he's, this associate is let go, so would it have been FICA wages? If an associate in a law firm is separated and given a payment. And let's suppose it's, right. It would be FICA wages. Okay, now. What was your answer? Yes. Yes. Okay, and what would it take to change my, what would I have to change in my hypothetical to turn it into something which, after the enactment, would qualify as a sub? You said it wasn't a sub. It wouldn't be a sub. But it wouldn't be sub today, either. Well, I understand, but I changed my hypothetical to make it a sub in 1968. Is it because it's not pursuant to a plan, or what is it? I'll change your hypothetical. Instead of being a law firm, it's an automobile manufacturer. Well, but I'm trying to take it out of the wage earners and put it into a salary context. Well, but that's precisely what you should not be doing. Well, why? Because there's nothing in this that says, nothing in the statute that says this doesn't apply to salaried employees, right? No, that's correct, and of course we are arguing. So I guess the question is why isn't it a sub? Let's start, let's approach the question this way. Why wouldn't it be a sub? Because, first of all, a sub payment requires a reduction in force. That's what your law firm just had, or the other law firm. Reduction in force. I'm not sure they're letting one individual go. No, they let ten go. Gives rise. They let ten go. Business wasn't quite the way it is in Washington. Business was falling off, so they let all the associates go, first in, first out. But they gave each of them a $25,000 goodbye severance payment. I think it's the analogy. I think you're straining too hard for the analogy. Well, why? You're talking about an industrial concept. I know the context is different, but what I'm trying to get at is what exactly did Congress do when it enacted 3402? Did it change something that was very basic about the FICA tax law when it did that? And did it do that in a way that is plausibly intended? So, to carry through with my analysis, if a person in the position of your associate is in fact subject to FICA on that, then one would have to ask the question, when Congress decided to make that payment, arguably, that payment, subject to withholding from the income tax, did it also, by the use of terms in 3402, by implication, remove that payment from FICA? And that seems improbable. That payment would have been subject to withholding before 3402. That's what the difference was. That payment would have been subject to withholding. That payment was not subject to withholding until 3402. The payment from the law firm was subject to withholding. Why? Because it wasn't sub. Well, why was it not a sub? What was it about? We come back to that question. You keep saying it's not a sub. Surely not because your law firm doesn't have blue-collar workers. I mean, that's not your argument, right? That's why it wasn't a sub? Well, to some extent it is. The point is that— There's nothing in the statute that says they have to be working at an automobile plant. A sub is an involuntary separation based on a reduction in force, right? Right. Right. Couldn't that happen in this courthouse? Couldn't it happen in your law firm? Well, you have to have a plan. All right. We have a plan. Yeah, we have a plan. Then you've got a sub, right? What we're trying to understand, don't you see, is what was the history before the statute, and how did the statute change that history both for withholding and indirectly, if that's your argument, for FICA? Because there's a linkage there that's hard to deal with. Well, I would like to try to answer that question, Your Honor, but I would like to try to answer it without this limitation of the law firm, which in my mind confuses it. Can I try and answer it on an industrial basis? Sure. Before 3402 law. Okay. Okay. Before 3402 law. What was the case in both withholding and in FICA? Before 3402 law, sub was not subject to withholding, not subject to FICA. That was the case before 3402 law. Now, what authority do you rely on to say that it wasn't subject to FICA? Right. How do we know that, other than trusting you, which of course we do implicitly, but how do we know it otherwise? Because there were IRS rulings that said it was not subject to FICA. Well, there's what, 50, is it the 58, 56, 58? There is a revenue ruling. Yeah, 56. 56. Right. But that is in terms of contract buyouts, as I understand it. Right? And wasn't that limited in 65? And there have been a couple of later revenue rulings, I think, that seem to narrow that. The reason I picked the law firm, actually, was I'm trying to give you a hypothetical that would not implicate the 56 revenue ruling, and wouldn't have a contract buyout, but be rather in an employment without contract. No, it's not subject. I think Your Honor is thinking of some rules other than the one that, other than this 56-249 that I'm talking about. The 56-249 was not a contract buyout. But you're telling us that the law was clear prior to 34020. Is that what you're telling us? Yes. And the law was also subject to the whimsy of the IRS, and they made rulings all over the place, as they happened to see fit. But the fundamental ruling was that SUB was not subject to income tax withholding or to FICA. And after 34020, SUB was subject to income tax withholding and not to FICA. The revenue ruling, I was thinking, was the 58. It's 58-301 that deals with the buyout of the employment contract. Right. Yes. And that, I think, was not. Yes. But I was thinking about the reduction. I understand. I understand. Both in the 50s. Okay. Well, we've gone quite a ways over your allotted time, but we will reserve, restore to you the seven minutes that I think you had reserved for the cross-appeal response. And we'll hear from Mr. Green. Thank you. Thank you. Okay. We can add seven minutes, and then if Mr. Green needs it, I believe that was about 16 minutes, was it, additional time that we had? Eighteen. Eighteen. Okay. Why don't we, in the event Mr. Green needs it, in the interest of fairness, we'll give it to him. We'll see. Mr. Green, not to interfere with your presentation, but could you at least begin by dealing with the last question we were wrestling with, that is, pre-34020 and post-3420, what were the parallel rules? My understanding is that sub was not subject to FICA and income tax only if it comported with one of the revenue rulings, 1956 revenue ruling, basically. In that case, it was treated as not being wages. Otherwise, sub indeed was. So the general definition, the broad definition that you find in 34020, to the extent that it met that definition but did not meet one of the definitions of the revenue rulings, the 1956 revenue ruling, or some of the revenue rulings that followed, that would have been subject to both. Well, let me make sure I understand where the 1956 and 58, the reason this matters, it sounds like ancient history, but where you end up often depends on where you start. And here I'm trying to get a sense of what the baseline was in 1968 from which we can draw some inferences as to what Congress must have done by way of intending to make changes. So the baseline, I take it, 56 revenue ruling says, if I understand it, correct me if this is wrong, says that if you are linked, in the sense that that term has been used in the revenue rulings, to a state unemployment compensation scheme, then it's outside of the FICA, right? It had eight separate requirements. Right, but basically it was looking at linkage to the unemployment compensation, right? Okay, second is the 58, which talks about buyout of contract rights. Right? That's correct.  Now that revenue ruling, of course, has subsequently been superseded and modified because the services now said that the reasoning of the ruling was simply wrong. I understand. But it did exist at the time. That is not a sub-pay ruling. That actually goes more toward the North Dakota State Army. I understand, right. Okay, but those were the two, as I understand it, were the two exceptions to what I understood to be the general rule that severance payments were subject to FICA, and also were gross income. Right. Although not, prior to 3402, O withheld for purposes of income. Right. And as taxpayer has pointed out, what happened is that the service, instead of revoking the 56 revenue ruling, went to Congress, and Congress, in reaction to that 56 revenue ruling, passed 3402 O, basically saying that, well, to the extent that we have for income tax purposes, if these are not treated as wages, these people are going to be hit up with big bills years down the road, or at the end of the year. But for FICA tax purposes, those considerations didn't apply, and they simply, I would imagine, determined that, well, if the revenue ruling is going to be out there, it's going to be out there, and those payments that are treated under the revenue ruling as not being wages, they were going to leave it that way. So I take it your position could be summarized with respect to the enactment of 3402 and the purpose and the scope as follows, that prior to 3402, payments such as the ones that issue in this case would have been subject to FICA. 3402 did nothing more than simply make the same payments subject to income tax withholding and did not change anything about FICA and certainly didn't take these payments while it was making them subject to income tax withholding, sort of quietly take them out of FICA. Is that a fair statement of your position? That is a fair statement, and in addition to that, I'm not sure that these very payments that issue here would have qualified under the revenue rulings and so been exempt from income tax holding irrespective of 3402. But now Congress made it a very broad enactment to ensure that anything that is a subpay is indeed subject to income tax withholding. Let me modify Judge Bryson's question to you just slightly. He said as between withholding and FICA. My understanding is what you're saying, that is before 3402, you had taxable and FICA, both that is income. You have three things, income, withholding, and FICA. And you're saying before 3402, income and FICA were together, generally speaking, on the includability of severance packages except for the revenue rules. Yes. But withholding was an outlier. It was not includable in withholding. No, it wasn't. Withholding for income tax. For income tax. If it did not comply with the revenue rulings, it was subject to withholding for the income tax irrespective of 3402-0. Prior to 3402-0. Prior to 3402-0. So what was the point of 3402-0? I thought that was designed to overcome the rev rules. Exactly. It effectively stated that all subpay was subject to income tax withholding irrespective of the revenue rulings, which had not been revoked. The rev rules were focused on withholding, not on income. Is that what you're telling me? The revenue rulings were focused on both FICA and income tax withholding. Both FICA and income tax withholding. Well, now wait a minute. Now you've just switched me around again because what you're saying is that 3402 then was applicable both to withholding and to FICA. They did. When Congress enacted 3402-0, it only spoke to income tax withholding. But it had the same problem in withholding and in FICA at that point, didn't it? It did not have the same problem because the impetus behind requiring withholding for income tax is this big tax bill that's going to come up at the end of the year. No such concern as that stayed with respect to the FICA. And so my guess is what Congress simply said is that if the Internal Revenue Service wants to leave these revenue rulings out there exempting certain subpay, then so be it. But all other subpay that's not subject to those revenue rulings is subject to FICA. Counsel, is the government currently working on, I hope, a regulation that would bring clarity to this in the event that this court were to say that Rowan continues to survive after the 1983 enactment by Congress, which you argued decouples them? I simply don't know the answer to that. Because that would unquestionably, under any precedent that doubts the decoupling that occurred by Congress, any precedent that doubts that issue seems to acknowledge, however, that indisputably the 83 enactment allows for regulations that would change the landscape with regard to the coupled definitions, right? So going forward, it seems like you guys could clean up this mess pretty easily. This is a tough case. I won't deny that, and I simply don't know if there is a regulation project in existence. Obviously there's a large Internal Revenue Code with lots of regulation projects. I don't know where this one may be. Now, how do you get around Rowan? You just say 83 completely trumped it? We think that, yes, the 83, the decoupling amendment, trumped it, as we noted in our briefs below, that the case Environmental Defense versus Duke Energy of the Supreme Court makes clear that when determining whether to interpret identical words in a statute, the purpose of the provisions must be looked to. In other words, when you have some legislation, you look to the purpose and the intent of Congress in doing so. The Supreme Court did that in Rowan. It did it in Cleveland Indians. And here it's very clear from the legislative history that they intended to overrule Rowan. The House, the Senate, and the conference reports all state that amounts are exempt from income tax withholding are not exempt from FICA without an explicit exclusion. And indeed- So where have courts like our court and Anderson gotten the crazy idea then that it has to be only in cases that absolutely positively you all are allowed to decouple, you all, meaning the government, generally are allowed to decouple, but that absent your affirmatively doing that, we ought to treat the words wages the same in both statutes, which seems to me to make logical sense. I'm sure you would agree that logically, generally, the same word used in the same statute ought to be in similar statutes ought to be interpreted the same way. I mean, we all understand that to be a common principle of statutory construction. So where did we get this crazy idea in Anderson that regulation is required to decouple? Well, now, in Anderson, of course, it was only dictum. And the cases- I understand you say it's dictum. But the case itself actually relates it back to the holding. But nonetheless, say, I believe you, but where did they get that idea? Where did it come from? Well, I think it was simply a misunderstanding that Rowan was not overruled by the 83. How did they come up with that misunderstanding? What's the basis upon which the court got the idea? I can't believe they pulled it out of thin air. I'm not sure that when the argument came forth in Anderson to the extent to which Rowan was at issue and the extent to which the 83 event was explained to the court. Well, this may not be as much of a problem for you as it is for us. We have the Anderson case. Your case would be much easier, I think, if Anderson weren't sitting there. I do think that the Second Circuit case, which I misidentified, but I think it is Canisius, if I've got the right name now, and Third Circuit, First Circuit, seem to have taken a different view of this 83 statute. That's fair to say, don't you think? Yes. I mean, a dramatically different view. Yes. A conflict-in-the-circuits type different view. Well, to the extent that this is a circuit position in Anderson, right? Yes. But we're stuck with it, so we can't override Anderson unless there's some ground for doing so. You say that Duke Energy gives us a sufficient ground? Well, I think that Duke Energy instructs you to look to the purposes and the intent of Congress in enacting the 83 decoupling legislation. Indeed, they specifically stated that Rowan was not simply decided upon this identity of words, but was decided upon the idea that Congress was looking for... Simplicity and ease of administration. Exactly. And I think the 83 amendment demonstrated that... And also they said that there was no indication that Congress intended a different interpretation. And I think that the 83 amendment makes it clear that both of those are simply mistaken now, that they did intend a different interpretation. But the 83 amendment was before the Anderson decision, and to the extent that Anderson interpreted that, does the Duke Energy decision allow us to trump Anderson? Because does the Duke Energy decision give us a ground to say this is something that we are now bound to follow that trumps our decision in Anderson? Well, I guess Anderson was a different issue, and we're talking about a sentence from the court in a footnote that at least we believe was dictum and would not be binding on this court in any event. But I think that the environmental defense versus Duke Energy case does instruct the court of what to look for, and to the extent that it's possible that the issue wasn't squarely presented before the court before even if we do view it as a holding, it gives you room to take a look and follow the new Supreme Court precedent,  of what the Supreme Court was saying in Roe. To get where you want to go, let me see if I understand what we'd have to do. We would have to say that Rowan is no longer good law. And we would have to say that that was true because the parallelism that Rowan calls for between the withholding tax and the FICA tax in terms of definitions and applications was overtaken by the 83 Amendment, which Congress intended to be read broadly so that those parallels no longer exist as a matter of law. And that anything in our precedent that thinks otherwise has to be either distinguished or, if necessary, overtaken in an en banc, whatever we may determine Anderson really means to us. And that as a consequence of doing that, we can then read what is currently the rules applicable to withholding differently from the rules applicable to FICA. Do I have the sequence correct? But I think when you say the only way, that I think other consideration is just the application of Rowan. Even if we say that Rowan was not overruled, the application of Rowan to this case is just very odd. It seems to me that given the purpose and effect of 3402 is to make clear that subpay is subject to withholding for income tax purposes, it's just very odd to invoke Rowan to hold that it somehow says that establishing subpay isn't subject to withholding for FICA purposes. So what you're saying is... I've been struggling with this Rowanized problem. I accused him of it. I really meant it for you. What you're saying is we could read Rowan more narrowly. How can we escape this dilemma? I just don't think that the Supreme Court in Rowan, given the precise situation here, would have come out to the result that the court here came out to. That, as I say, it takes a provision that was intended to expand withholding and somehow backdoor-wise narrows it elsewhere. Both Rowan and Anderson, I guess, involved specific designated categories of benefits that were deemed... It was argued to be in one... The same language that was argued to be under one tax scheme to be included and in the other tax scheme to be excluded. Correct? I think it was... Including benefits was the language in Anderson that showed up in both statutes. The argument that was being rejected was the suggestion that including benefits in FICA could mean something different from the exact same language that showed up in the income tax statute and that you'd have a different result as to whether one is taxable in one versus the other. That's my understanding of what Rowan and Anderson are both about, correct? Right. Right. So your argument, then, I take it, is that it's quite a stretch to say that an implication from the use of... should be treated as if wages is an implication from which we can draw the inference that in FICA, these same kinds of payments are not wages. That's stretching the Rowan equivalent language too far. Is that essentially your point? There is no similar provision to 3402 in the FICA provisions at all. If this court were to determine that Rowan still applied and that subpayment, in fact, is not wages, we think that none of the payments here qualified as subpayment. Before you go into changing gears, can I ask you a question just about the practical impact of this decision? Is this case, in your view, limited to the pre-1990 era given the change in... I guess it's the 1990 revenue ruling that altered or obviated the 77 ruling? Do you think that post-90, any of this dispute continues to be a live dispute? To the extent that a payment qualifies under the outstanding revenue rulings, including the 90 revenue ruling, I'm not sure it would be subject to FICA. If a subpay qualifies under the outstanding revenue rulings, it would not be subject to FICA because that's what the revenue ruling said. It would still be subject to income tax withholding because that's what 3402 says. So you think that Judge Wiese's opinion, if we were to affirm across the board, that with respect at least to those employees and similar employees today who were getting benefits that Judge Wiese said were not subject to FICA, would still today have the same argument, or the employers would have the same argument that employees in that position were not subject to FICA? Has the ground shifted with respect to post-90 payments? You understand where I'm going. I want to know if we're talking about history or we're talking about a dispute that has important current implications. Well, to the extent that you were to affirm Judge Wiese's decision, obviously the categories of employees that were... These categories did not fit within the revenue rulings. So he has gone further than the revenue rulings to say that all subpay, as opposed to just subpay that fits within the revenue ruling, would be excludable from FICA and FUTA. So to that extent, it continues on. Well, the 77 revenue ruling was pretty broad, if I recall it correctly. Wouldn't you agree it's broader than the 90, right? The 90 went back to linkage. Right, the 77... The 77 didn't. It delinked. It got rid of the 56 linkage, if I recall correctly. That's right. And that was pretty broad. But now we're back in the universe where we've got a very narrow revenue ruling with respect to what qualifies, right? Well, while the 77 delinked that part of it, there are still other requirements in the revenue rulings that always exist and that have to be satisfied. It has to be paid from a separate trust, for example. These payments weren't made from a separate trust. So right there, they wouldn't satisfy the 77. So you don't think this case is predicated on compliance with the 77 ruling, which would not be... There would not be compliance in a case like this with the 90 ruling. Right. What taxpayers here have done basically with the revenue rulings was picked and choose different things and said, well, you don't have to have this under these situations. Then they pulled out the I don't have to have this and ignored under these situations. There's been no argument here that the taxpayers have satisfied any specific revenue ruling in all of its requirements. Again... No matter what Congress enacted in the Internal Revenue Code with regard to the word wages, no matter what they enacted, if they enacted other exclusions from wages and put them in the Internal Revenue Code, you would say similarly none of those apply to FICA because FICA should be treated differently. It was decoupled. The definition was decoupled. If they enacted specific exclusions... If there are additional specific exclusions that come along. If another 34020 type of thing was enacted pertaining to something slightly different, you would argue that no matter what Congress legislates with regard to the Internal Revenue Code, it is not similarly applicable automatically to FICA for the definition of wages. Right. The IRACO establishes that the definition of wages for FICA is very broad. And yes. Well, if you don't have anything further, or if you do, do you have something that we need to hear? Well, I was just going to move on to the questions of whether the various payments themselves were subpayments. I think we have that part of the... This is the part that I think all of us are in trouble with. Thank you. Mr. Shulman, your seven minutes for response to the cross-appeal. Thank you, Your Honor. I have in mind a short bubble. Let's see. I would like to... make just three points. The first one is, this has to do with the question that you were asking about the relationship of 34 over 2 over 56, 249. Right. That question, I think, is more appropriately addressed to 501C17 versus 56249. 501C17 being the 1959 statute. The life of 56249... But that statute has the same language as 34 over 2. Exactly. They just plucked it right out of 517. Exactly. I was just simply saying to you that the issue arose in 59 as well as repeated in 69. Right. But in 69, they took that language and said, okay, now withhold. That's exactly right. I didn't disagree, but I just wanted to make it that point. Now, the next point I want to make is simply about the Anderson case. You know, the Anderson court cited Kinesius. This is not... Judge Ward pointed out that the 83 amendments had taken place before Anderson, but Anderson actually cites Kinesius. And you'll find that... I've got it here on page 3, but it's... It's just before footnote 3. You actually cite Kinesius for the proposition of decoupling. And indeed, Temple University, which was also the same holding. And then my third point is a very simple one. I mentioned to you earlier that this case is about exclusions, what can be excluded from wages and what can do it. And I would just like to read to your honors the three-sentence paragraph, the last paragraph, in the decision of the Supreme Court in Central Illinois. This is not to say, of course, that the Congress may not subject lunch reimbursements to withholding. If in its wisdom, it chooses to do so by expanding the definition of wages for withholding. It has not done so as yet. And we cannot justify the government's attempt to do so by judicial determination. And I suggest to the court that that is precisely what is going on in this case. I have one factual question for you before you leave, if I may. I take it what you're asking for us to give you back is the employer's share of the FICA taxes that you've paid? Somewhat more than that. We are also acting on behalf of employees. That's what I wanted to get to. I didn't see if the employees were referenced or represented in this case at all. Are they? Yes. There were some employees who we were unable to make contact with who were not represented. I believe that the decision of Judge Reese describes the employees who are included. Okay. I missed that. Thank you. Very well. Now, Mr. Green, since you're a cross-appellant, you technically have the right to the last word here, but you don't have to exercise your right. I have nothing unless the court has further questions for me. Thank you. The case then is submitted, and we thank both counsel for a helpful argument. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.